# Exhibit 1

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
Release No. 10987 / September 24, 2021

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 93124 / September 24, 2021

**INVESTMENT ADVISERS ACT OF 1940**
Release No. 5872 / September 24, 2021

**INVESTMENT COMPANY ACT OF 1940**
Release No. 34382 / September 24, 2021

**ADMINISTRATIVE PROCEEDING**
File No. 3-20597

| | |
|---|---|
| **In the Matter of**<br><br>**Resolute Capital Partners LTD, LLC,**<br>**Homebound Resources, LLC,**<br>**Thomas J. Powell, and**<br>**Stefan T. Toth,**<br><br>Respondents. | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940, AND SECTION 203(f) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("SEC" or "Commission") deems it appropriate and in the public interest that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") against Resolute Capital Partners LTD, LLC ("RCP") and Homebound Resources, LLC ("Homebound"); that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act, Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against Stefan T. Toth ("Toth"); and that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act, Sections 15(b), and 21C of the

Exchange Act, Section 9(b) of the Investment Company Act, and Section 203(f) of the Investment Advisers Act of 1940 ("Advisers Act") against Thomas J. Powell ("Powell") (collectively, "Respondents").

## II.

In anticipation of the institution of these proceedings, Respondents have each submitted an Offer of Settlement (the "Offers") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933, Sections 15(b) and 21C of the Securities Exchange Act of 1934, Section 9(b) of the Investment Company Act of 1940, and Section 203(f) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order").

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that

### Summary

1.     These proceedings concern material misrepresentations and omissions made in connection with unregistered oil and gas securities offerings by Powell and Toth, and two entities they respectively control, RCP and Homebound.  Between 2016 and 2019 (the "Relevant Period"), Respondents and salespeople acting on their behalf sold more than $250 million of debt and equity securities in unregistered offerings, based on working interests in oil and gas wells, to retail investors.  Respondents provided insufficiently supported projections of future oil production, made statements about potential tax benefits that were unavailable to certain investors, overstated cash reserves, and made incomplete disclosures regarding potential uses of investor funds, including the amount of funds that would be used for payments to prior debt and equity investors.  Respondents should have known that their statements and omissions were materially misleading.

2.     As a result, Respondents violated the antifraud provisions of Securities Act Sections 17(a)(2) and 17(a)(3).  In addition, Respondents violated Sections 5(a) and 5(c) of the Securities Act by offering and selling securities without having a registration statement filed or in effect with the Commission.  Finally, Respondents Powell and Toth violated Section 15(a) of the Exchange Act by acting as unregistered brokers in connection with the offerings.

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

## Respondents

3. **Resolute Capital Partners LTD, LLC** ("RCP") is a Nevada company with offices in Texas, California and Minnesota. Powell was the owner of RCP and its Senior Managing Partner during the Relevant Period. RCP created numerous oil and gas debt and equity investment vehicles using wells identified by Homebound Resources, LLC and its affiliates. RCP, through its affiliates, also has ownership stakes in certain of the equity offerings. RCP describes itself as a private equity firm that "gives smart investors access to beyond-Wall Street assets, such as oil and gas wells."

4. **Homebound Resources, LLC** ("Homebound") is a Texas company located in Irving, Texas. Homebound, created in 2014 and managed by Toth, is a subsidiary of Homebound Financial Group, LP ("Homebound Financial"). Homebound acts as a project sponsor for RCP's offerings and was responsible for identifying and purchasing the oil and gas wells in which the RCP investment vehicles owned working interests.

5. **Thomas Joseph Powell**, age 53, is a resident of Reno, Nevada. Powell is the owner of RCP and other related entities, and serves as the Senior Managing Partner of RCP. During the Relevant Period, Powell was the owner and Chief Executive Officer of Resolute Capital Advisors, LLC, an SEC-registered investment adviser responsible for advising various RCP and Homebound funds. For part of the Relevant Period, Powell also was a consultant to Homebound and its acting Chief Financial Officer. Powell has never been associated with a registered broker-dealer. Powell held a Series 65 license.

6. **Stefan Tiberiu Toth**, age 48, is a resident of Frisco, Texas. Toth is the founder, co-owner, Chairman and Chief Executive Officer of Homebound Financial, and also operates and controls its subsidiaries, including Homebound and PetroRock Mineral Holdings, LLC. Toth has never been associated with a registered broker-dealer.

## Other Relevant Entities

7. **PetroRock Mineral Holdings, LLC ("PetroRock")** is a Texas company located in Irving, Texas. Like its sister company Homebound, PetroRock is a subsidiary of Homebound Financial and is managed by Toth.

8. **Resolute Capital Advisors, LLC ("RCA")** was formed as a Nevada limited liability company in June 2017, and was converted to a Delaware LLC in November 2018. RCA registered with the SEC in September 2018 as an investment adviser. RCA is the adviser to certain of the issuers described below (Choice Energy Holdings II, LLC, Choice Energy Holdings III, LLC, Legacy Energy, LLC, Legacy Energy II, LLC, and SEA IV-VIII).

**Facts**

**Unregistered Offerings**

9. Respondents sold equity securities to investors in the form of membership interests in the pooled investment vehicles listed in Figure 1 ("Equity Funds") below. The offering materials for these equity securities offered investors monetary distributions based on well revenue and any subsequent sale of the wells. None of these offerings were registered with the Commission.

10. Respondents also sold debt securities to investors in the form of promissory notes. The promissory notes were issued by the companies listed in Figure 2 ("Debt Funds") below, which raised money and lent it to their parent company. The notes offered fixed returns ranging from 8% to 12% per year, depending on the term. None of these offerings were registered with the Commission.

11. Respondents claimed exemptions from registration for all of these offerings pursuant to provisions of the Securities Act and Regulation D, but no exemption from registration was applicable. Respondents offered the securities through general solicitation, including seminars, dinners and paid radio shows. Moreover, Respondents failed to take reasonable steps to verify the accredited status of investors when applicable under the claimed exemption, and sold certain of the unregistered securities to approximately 200 non-accredited investors.

12. Salespeople acting on behalf of Respondents directed investors with traditional retirement accounts that did not allow investments in unregistered oil and gas offerings to companies that assisted the investors in opening, and transferring their retirement funds to, self-directed individual retirement accounts. Investors then used those accounts to purchase securities issued by the Equity and Debt Funds.

13. Neither Powell nor Toth was registered as a broker-dealer or associated with a registered broker-dealer, yet each participated in selling these unregistered securities. They described RCP and Homebound and the Equity and Debt Funds at investor dinners and investor seminars and advised potential investors on the merits of participating, were involved in setting the contractual terms between the issuers and investors, and oversaw the handling of investors' funds. Each of them also directed RCP and Homebound to pay transaction-based compensation in the form of commissions to salespeople who referred investors to the Equity and Debt Funds, and were entitled to certain transaction-based compensation themselves, in the form of overrides, based on the performance of these salespeople.

**Respondents Made Material Misstatements and Omitted Material Facts in the Equity Offerings**

14.     The Equity Funds were pooled investment vehicles that sold LLC interests to investors. Each of the Equity Funds then purchased a percentage working interest in a set of oil and gas wells identified and purchased by Homebound. Respondents offered the following Equity Funds during the Relevant Period:

Figure 1:  Unregistered Equity Offerings During the Relevant Period

| Offering | Open Date | Money Raised |
|---|---|---|
| HBR VI | July 2016 | $3,295,000 |
| SEA III | December 2016 | $3,995,520 |
| SEA IV | February 2017 | $4,000,000 |
| SEA V | September 2017 | $4,393,300 |
| SEA VI | December 2017 | $4,587,600 |
| SEA VII | May 2018 | $30,589,300 |
| SEA VIII | October 2019 | $10,480,000 |
| **Total** | | **$61,340,720** |

15.     Powell and Toth had ultimate authority over the statements in the offering materials for these Equity Funds that were provided to investors. The offering materials were approved by Powell on behalf of RCP and Toth on behalf of Homebound, and created a materially misleading impression of RCP and Homebound's operations. For example, the offering materials stated that the securities were being sold by SEC-registered and FINRA-member broker-dealers. In fact, the primary sellers of the securities were unregistered brokers.

16.     In addition, potential investors in the Equity Funds were provided with a "one-pager" document that typically featured the RCP and Homebound logos. The documents were approved by Powell on behalf of RCP and Toth on behalf of Homebound. The one-pagers contained insufficiently supported oil well production projections regarding the performance of the oil wells in which the Equity Funds owned working interests, particularly in light of prior experience. The one-pagers for SEA IV, SEA V and SEA VI each projected the same production of barrels of oil per day even though each of the Funds owned working interests in different wells in different regions. Moreover, at the time of these offerings, the wells owned by Homebound had a track record that fell well short of RCP's prior projections. For example, RCP had similarly projected 510 barrels of oil per day and 762,625 total barrels over a 3 to 5 year period for SEA III. Instead, after nearly two years of production, the SEA III wells produced an average of 40 barrels of oil per day, with just 27,857 total barrels. The SEA IV through SEA VI one-pagers nevertheless

5

included, and failed to meet, the exact same projections.  The SEA VII materials included even larger insufficiently supported projections that Respondents could not meet:

| Offering | Projected Production | Actual Production |
|---|---|---|
| **SEA IV** | 510 barrels/day | 5 barrels/day |
| **SEA V** | 510 barrels/day | 3 barrels/day |
| **SEA VI** | 510 barrels/day | 5 barrels/day |
| **SEA VII** | 2,210 barrels/day | 199 barrels/day |

17. Offerings materials for the Equity Funds also did not adequately disclose the amount or percentage of investor funds that would be used for marketing expenses, commissions to salespeople, expenses and salaries of Homebound and RCP employees and consultants, and payments to investors from prior offerings.

18. In addition, Respondents made statements about the potential tax benefits of these investments that were misleading to retirement account investors.  Specifically, Respondents provided investors with a document drafted by Powell entitled "Tax Benefits of U.S. Oil & Gas Investments." The document described potential tax benefits associated with investments in oil and gas, but did not disclose that the benefits were not available to retirement account investors.

### Respondents Made Material Misstatements and Omitted Material Facts in the Debt Offerings

19. The debt offerings sold by Respondents involved promissory notes issued by financing companies wholly-owned by PetroRock, a company owned by Homebound Financial and managed by Toth.  Each of the Debt Funds lent the money it raised from investors to PetroRock.  Respondents offered and sold securities issued by the following Debt Funds during the Relevant Period:

6

Figure 2: Unregistered Debt Offerings During the Relevant Period

| Offering | Open Date | Money Raised |
|---|---|---|
| HBR VI | May 2016 | $3,200,000 |
| SEA III | November 2016 | $3,750,000 |
| PRMH Lenders Fund | April 2017 | $20,008,750 |
| PRMH Lenders Fund II | May 2017 | $19,491,250 |
| PRMH Lenders Fund III | November 2017 | $20,529,000 |
| PRMH Lenders Fund IV | December 2017 | $21,643,000 |
| Choice Energy I | January 2018 | $13,418,000 |
| Legacy Energy | March 2018 | $39,702,000 |
| Legacy Energy II | May 2018 | $7,454,517 |
| Choice Energy II | July 2018 | $13,134,600 |
| Choice Energy III | August 2018 | $37,673,764 |
| **Total** | | **$192,550,364** |

20.     Offering materials approved by Powell and Toth and utilized by Respondents for the debt offerings contained statements and omissions concerning the use of investor funds that created a materially misleading impression. The offering materials disclosed that the issuers would lend funds to PetroRock and that PetroRock would use the funds to acquire oil and gas leases, fund its business operations and investments, and, in certain offerings, make interest payments on other PetroRock debt. These disclosures were materially misleading because investors were not told that the majority of assets raised would be used to make payments to investors in other Debt Funds.

21.     The offering materials for the PRMH Lenders Fund I-IV debt offerings stated that PetroRock would allocate *all funds* it received in predetermined percentages to specific uses, including land, royalty/mineral rights, oil and gas working interests, and 20% for "cash reserves." These statements were materially misleading because, in addition to failing to disclose that funds would be used to repay prior investors, PetroRock did not have the $15 million that it should have held in cash reserves to satisfy the 20% pledge. In fact, by the end of 2019, PetroRock had less than $100,000 in cash, with only $12,600 earmarked for the four PRMH Lenders Funds.

22.     In early 2018, Legacy Energy raised approximately $39.7 million from investors through the sale of promissory notes offering 8-9% annual interest, and loaned the money raised from investors to PetroRock. In the offering materials prepared by Powell and Toth, prospective investors were told that the "primary purpose" of Legacy Energy was to "finance the business and investment operations of PetroRock in connection with its Oil and Gas Interests" and that the funds

7

they provided may be used for, among other things, the "repayment of other debt, loans and promissory notes" of PetroRock affiliates.

23. The offering materials for Legacy Energy were materially misleading because they failed to disclose that some of the funds it received from investors and loaned to PetroRock would be used to make distributions to equity investors in an undisclosed related-party transaction. Nearly half of the money raised was used to close-out the HBR VI and SEA III Funds, including making distributions to equity investors in those Funds. Respondents made those payments through a series of related-party transactions that Respondents did not disclose in the offering materials. PetroRock loaned the money it received from Legacy Energy to Texas Mineral Holdings, LLC ("TMH"), an entity owned by Homebound, Powell, and other RCP employees. TMH then used the money to purchase the oil well interests owned by HBR VI and SEA III. Respondents set the price for that transaction without an independent appraisal or any other market-based valuation.

24. Respondents touted the success of the HBR VI and SEA III offerings in marketing efforts for subsequent offerings, while failing to disclose the related-party nature of the sale of the HBR VI and SEA III well interests. Respondents stated that their investment vehicles had returned $93 million to oil and gas equity and debt investors, and that equity investors in HBR VI and SEA III had enjoyed an average 11% rate of return. These claims were materially misleading because Respondents failed to disclose that these purported returns were based on related-party and not market-based transactions, and came primarily from other investor funds as opposed to successful operations.

## Violations

25. As a result of the conduct described above, Respondents Powell, Toth, RCP and Homebound willfully[2] violated Section 17(a)(2) of the Securities Act, which makes it unlawful for "any person in the offer or sale of securities . . . directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material

---

[2] "Willfully," for purposes of imposing the relief contained in this Order, "'means no more than that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "also be aware that he is violating one of the Rules or Acts." *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965). The decision in *The Robare Group, Ltd. v. SEC*, which construed the term "willfully" for purposes of a differently structured statutory provision, does not alter that standard. 922 F.3d 468, 478-79 (D.C. Cir. 2019) (setting forth the showing required to establish that a person has "willfully omit[ted]" material information from a required disclosure in violation of Section 207 of the Advisers Act).

8

fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."[3]

26. As a result of the conduct described above, Respondents Powell, Toth, RCP and Homebound willfully violated Section 17(a)(3) of the Securities Act, which makes it unlawful for "any person in the offer or sale of any securities . . . to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

27. As a result of the conduct described above, Respondents Powell, Toth, RCP and Homebound willfully violated Section 5(a) of the Securities Act, which states that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such a security through the use or medium of any prospectus or otherwise, or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

28. As a result of the conduct described above, Respondents Powell, Toth, RCP and Homebound willfully violated Section 5(c) of the Securities Act, which states that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security."

29. As a result of the conduct described above, Respondents Powell and Toth willfully violated Section 15(a) of the Exchange Act, which makes it unlawful for any broker or dealer "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance" with Section 15(b) of the Exchange Act. Section 3(a)(4) of the Exchange Act defines "broker" generally to mean "any person engaged in the business of effecting transactions in securities for the account of others."

## **Undertakings**

Respondents Powell, Toth, RCP and Homebound undertake to:

30. Refrain from participating, directly or indirectly, in any unregistered offer, issuance or sale of a security related to oil and gas for a period of two years after the date of this Order; provided, however, that such undertaking shall not prevent Respondents from purchasing or selling any securities, other than penny stocks, for their own personal accounts.

---

[3] A violation of either Section 17(a)(2) or Section 17(a)(3) of the Securities Act does not require scienter and may rest on a finding of negligence. *See Aaron v. SEC*, 446 U.S. 680, 685, 701-02 (1980).

31. Within ten (10) days of the entry of this Order, and for a period of three years, Respondents shall post a clearly referenced link to the Order in a prominent area of the home page of all RCP and Homebound web sites, and all other commercial web sites under Respondents' direction or control.

32. Engage, at Respondents' own expense, an Independent Compliance Consultant (the "Consultant"), not unacceptable to the Commission's staff, within forty-five (45) days of the issuance of this Order, and for a period of three years from the date of the Consultant's engagement. Respondents shall supply a copy of this Order to the Consultant. No later than twenty (20) days following the date of the Consultant's engagement, Respondents shall provide the Enforcement Division ("Division") staff with a copy of the engagement letter detailing the Consultant's responsibilities, which shall include the reviews and reports to be made by the Consultant as set forth in this Order.

    a. For the three year engagement period, Respondents shall require the Consultant to:

        i. Review Respondent RCP's and Homebound's policies and procedures, proposed offering materials for any securities offered by Respondents or any entity under the control of any of the Respondents, this Order, the federal securities law registration exemption that would be relied upon for the specific offering, and any other materials that the Consultant deems relevant, concerning the following topics:
- policies and procedures to provide reasonable assurance of the material accuracy and completeness of disclosures made in the offering materials;
- policies and procedures for determination of the accredited status of potential investors in light of the registration exemption applicable to the offering;
- the plan of distribution for the offering;
- policies and procedures for acceptance of retirement account funds in the offering;
- policies and procedures for determining any performance projections disclosed in the offering materials;
- policies and procedures for identifying and tracking marketing expenses relating to the offering;
- policies and procedures for setting and maintaining any cash reserves disclosed in the offering materials;
- policies and procedures for identifying and disclosing any related-party transactions concerning fund assets; and
- any other topic that the Consultant deems relevant to reasonably ensure compliance with the federal securities laws.

10

      ii. Certify, in writing (with a copy sent to the Division), prior to any offering of securities by Respondents, or any entity under the control of any of the Respondents, that the Consultant has reviewed the above-referenced policies and procedures and related materials in paragraph 32(a)(i), and any other materials that the Consultant deems relevant, and based on its review, (1) has determined that Respondents' policies and procedures for each of the above-referenced topics are reasonably designed to promote Respondents' compliance with the federal securities laws identified as violations in this Order, and (2) that Respondents are in compliance with the above-referenced policies and procedures in paragraph 32(a)(i). In instances where Respondents are not in compliance with the above-referenced policies and procedures or where the Consultant has identified any potential noncompliance with the federal securities law, the Consultant will promptly notify Respondents and propose steps to bring Respondents into compliance. If Respondents remain noncompliant after 45 days of any reported noncompliance, Consultant shall promptly notify the Division and copy the Respondents on such notification.

      iii. Submit an annual report to Respondents and the Division that describes the work done by the Consultant, including, but not limited to, the steps taken by Respondents to ensure that any offerings of securities are in compliance with the federal securities laws.

b. Respondents shall cooperate fully with the Consultant and shall provide the Consultant with access to such of Respondents' files, books, records, and personnel, except as protected by privilege and/or as attorney work product, as are reasonably requested by the Consultant for review.

c. Respondents shall require the Consultant to enter into an agreement that provides that for the period of engagement and for a period of two years from completion of the engagement, the Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondents, or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity. The agreement will also provide that the Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Commission's Director of Enforcement, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondents, or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

11

    d. To ensure the independence of the Consultant, Respondents: (1) shall not have the authority to terminate the Consultant or substitute another Independent Compliance Consultant for the initial Consultant, without the prior written approval of the Commission staff; and (2) shall compensate the Consultant and persons engaged to assist the Consultant for services rendered pursuant to this Order at the rates agreed to in the engagement letter.

    e. The reports by the Consultant will likely include confidential financial, proprietary, competitive business or commercial information. Public disclosure of the reports could discourage cooperation, impede pending or potential government investigations or undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except (1) pursuant to court order, (2) as agreed to by the parties in writing, (3) to the extent that the Commission determines in its sole discretion that disclosure would be in furtherance of the Commission's discharge of its duties and responsibilities, or (4) is otherwise required by law.

33. Certify, in writing, compliance with the undertakings set forth above. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondents agree to provide such evidence. The certification and supporting material shall be submitted to Assistant Director Brian O. Quinn (100 F Street NE, Washington, D.C. 20549), with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60) days from the date of the completion of the undertakings.

### IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Section 8A of the Securities Act, Sections 15(b)(6) and 21C of the Exchange Act, Section 203(f) of the Advisers Act, and Section 9(b) of the Investment Company Act, it is hereby ORDERED that:

A. Respondents shall cease and desist from committing or causing any violations and any future violations of Sections 5(a), 5(c) and 17(a)(2) and (3) of the Securities Act.

B. Respondents Powell and Toth shall cease and desist from committing or causing any violations and any future violations of Section 15(a) of the Exchange Act.

C. Respondents shall comply with the undertakings enumerated in paragraphs 30 through 33 above.

D. Respondents Powell and Toth be, and hereby are:

> barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization;
>
> prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter; and
>
> barred from participating in any offering of a penny stock, including: acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock.

with the right to apply for reentry after two (2) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

E. Any reapplication for association by Respondents Powell and Toth will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, compliance with the Commission's order and payment of any or all of the following:  (a) any disgorgement or civil penalties ordered by a Court against the Respondents in any action brought by the Commission; (b) any disgorgement amounts ordered against the Respondents for which the Commission waived payment; (c) any arbitration award related to the conduct that served as the basis for the Commission order; (d) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (e) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

F. Respondent Powell shall, within seven days of the entry of this Order, pay a civil money penalty in the amount of $75,000 to the Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

G. Respondent Toth shall, within seven days of the entry of this Order, pay a civil money penalty in the amount of $75,000 to the Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

H. Respondent RCP shall, within seven days of the entry of this Order, pay a civil money penalty in the amount of $225,000 to the Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

I.     Respondent Homebound shall, within seven days of the entry of this Order, pay a civil money penalty in the amount of $225,000 to the Commission. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)    Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying the respective Respondent's name as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Carolyn Welshhans, Associate Director, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549.

J.     Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund is created for the penalties referenced in paragraphs F through I above. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in these proceedings. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on

behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in these proceedings.

**V.**

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the findings in this Order are true and admitted by Respondents Powell and Toth, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondents Powell and Toth under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with these proceedings, is a debt for the violation by Respondents Powell and Toth of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

By the Commission.

    Vanessa A. Countryman
    Secretary